January Term, 1862.

Todd
v.
Lee et al.

---

TODD vs. LYDIA A. and FRANCIS C. LEE.

WRIGHT and others vs. THE SAME.

JAFFRAY and others vs. THE SAME.

TAYLOR and another vs. THE SAME.

FARIES vs. THE SAME.

| 15 | 365 |
|----|-----|
| 74 | 586 |
| 15 | 365 |
| 83 | 578 |
| 15 | 365 |
| 86 | 401 |
| 15 | 365 |
| d111 | ¹ 44 |
| 111 | ⁵ 45 |
| 15 | 365 |
| 114 | 578 |

The contracts of a *feme covert*, when necessary or convenient to the proper use and enjoyment of her separate estate, under chap. 95, R. S. 1858, are binding at law. *Conway vs. Smith and wife*, 13 Wis., 125.

All her other engagements stand as before the passage of the statute, good only in equity.

The change from an equitable to a legal estate has not, with respect to them, enlarged her powers or removed the disability of coverture, but she remains, as if still possessed of an estate in equity without restriction as to her power of disposition, capable of charging it with debts contracted for her benefit, or the benefit of her estate.

The case of *Yale vs. Dederer*, 22 N. Y., 450, considered and disapproved. S. C., 18 N. Y., 265, approved.

L., a *feme covert* and owner of a separate estate under chap. 95, R. S. 1858, with her husband's permission, and upon the faith and credit of her separate estate, purchased goods, hired a store and engaged in trade as if she were sole. She failed to pay for the rent, and refused to pay for the goods because of coverture. In actions brought to charge the rent and the price of the goods upon her separate estate, and to apply the goods left to liquidate the claims in suit, *Held*, that as it is an established rule in equity that a *feme covert* may, with her husband's permission, given even after marriage, become a *sole trader*, and hold the profits arising out of her business to her sole and separate use, so equity, in consideration of the benefit thus accruing to her separate property, will charge the debts properly incurred in trade upon it, and apply both her separate property and stock in trade to their payment, through a receiver.

Injunctions and receivers in such actions may be had, to preserve the property during the litigation, and to convert it into money and satisfy the debts.

*Quære*, whether one creditor bringing such an action, should not do so on behalf of all the creditors of the separate estate, or if several actions have been brought, whether these should not be consolidated.

The husband is a proper party in such actions, but no personal demand can be made against him therein. His personal liability, whatever it is, is legal, and must be enforced at law.

Whether, as the wife now has authority at *law* to hold and dispose of personal property which comes to her as separate estate, equity would not protect her earnings as a sole trader, from the demands of her husband's creditors, need not be here determined.

APPEALS from the Circuit Courts for *Milwaukee* and *Dane* Counties.

These actions were commenced in the county court for Milwaukee county, to charge *Mrs. Lee's* separate property with the payment of debts incurred by her in separate trade, and to reach the capital invested in the business. Three of the suits were removed to the circuit court of that county, where orders obtained in the county court, granting injunctions and appointing a receiver to restrain the dissipation of the property and preserve it during the litigation, were vacated. From the orders dissolving the injunctions and vacating the order appointing a receiver, the plaintiffs appealed. The other two suits were sent to the circuit court for *Dane* county, where, upon the hearing, they were dismissed, and judgments for costs given against the plaintiffs, from which they appealed.

The finding of the circuit judge in the case of *Taylor et al. vs. Lee and wife*, was as follows: "That said defendant *Lydia A. Lee*, is a married woman living and cohabiting with her husband, *Francis C. Lee*; that the debt in question was for goods sold upon credit to said defendant *Lydia*, to enable her to engage in the business of selling millinery goods and carrying on a general business as a *trader* in selling goods; that said *Lydia*, at the time she purchased said goods of the plaintiffs, represented to them that she was desirous to engage in the millinery business, and that if they would sell to her goods for that purpose she would apply her separate estate, consisting of real estate, school land certificates, insurance stock and bonds and mortgages, to the payment therefor; that the plaintiffs, relying upon that promise, sold the goods to her upon credit, and charged them to her; that said goods were purchased by said *Lydia* with the knowledge and consent of her husband, and they (or a portion of them)

were used by her in her millinery business; that plaintiffs knew at the time they sold the goods to her, that she was a married woman; and that $753.06 of the price of said goods remained due and unpaid." As a conclusion of law, the judge held that the plaintiffs had no legal or equitable claim against the defendant *Lydia*, or against her separate estate.

The complaint contained a description of the real estate of which *Mrs. Lee* was seized in her own right at the time the goods were purchased, and demanded judgment against the defendants, "that the separate estate of said *Lydia* be charged with the payment of her said debt to the plaintiffs, and that a receiver be appointed to take possession thereof, and sell so much of it as might be necessary to pay the plaintiff's demand," and for general relief. The evidence in the case was preserved by a bill of exceptions, and the material facts are stated in the opinion of the court. The questions involved in all the cases were nearly identical, the claim of *Faries* being for the rent of the store occupied by *Mrs. Lee*, and the claims of the plaintiffs in all the other cases being for goods sold to her.

*Merrick & Hill*, for appellants, contended that a married woman's separate estate is in equity liable for all the debts which she has expressly or by implication charged thereon. *Heath vs. Van Cott*, 9 Wis., 524; *Master vs. Fuller*, 4 Bro. C. C., 19. See also 23 Miss., 236; *Mayne vs. Griswold*, 3 Sandf. (S. C.), 463; *Yale vs. Dederer*, 18 N. Y., 265; *Rodemeyer vs. Rodman*, 5 Iowa, 426; *Colvin vs. Currier*, 22 Barb., 371; Story's Eq. Jur., §§ 1398-9. A married woman may, with her husbands's consent, engage in general trade. The stock in trade is liable to the claims of creditors who become such by contributing to it. They have in effect an equitable mortgage for the purchase money. This does not involve an unqualified power to engage in trade. The husband can at any time determine the separate trading, but he cannot defeat the equities of the wife to the profits acquired by her in her business, nor of the creditors to her stock in trade. Roper on Husband and Wife, ch. 18, IV, 2; 5 Duer, 480; 2 Bosw., 92. By the enabling statute (chap. 95 R. S., 1858),

January Term, 1862.

TODD
v.
LEE et al.

a married woman has power to buy and sell all kinds of property as if unmarried. *Norval vs. Rice*, 2 Wis., 22; *Wooster vs. Northrup* 5 id., 245; *Conway vs. Smith*, 13 id., 125. The husband has no rights in the property, even if it be purchased with his consent, and he incurs no liability for it. *Colby vs. Lamson*, 39 Maine, 119; *Oxnard vs. Swanton*, id., 125. 2. A married woman's separate property is liable for her debts, in whatever form they are incurred. In *Heath vs. Van Cott*, *supra*, this court charged Mrs. Van Cott's estate with payment of her husband's debt, because she evinced an intention to charge it, by giving a mortgage upon it. This intention may be shown by parol proof. *Murray vs. Barlee*, 3 Mylne & K., 209; *Yale vs. Dederer*, and *Conway vs. Smith*, *supra*. Besides, the goods sold Mrs. Lee increased her separate estate, and are a charge on it by implication.

*Finches, Lynde & Miller*, for respondents:

1. The contract was made in New York, and the laws of that state govern its construction. 19 How. (U. S.), 392; 4 Bennett (Miss.), 563. 2. Under the law of New York, this action could not be maintained upon the facts proven. 14 How. Pr. R., 385; 16 id., 93; 7 id., 105; 10 id., 109; 5 Duer, 476; 3 E. D. Smith, 311; *Yale vs. Dederer*, 22 N. Y., 450. In Maine and New Hampshire it is held that the "married women's act" does not give "unlimited power of contracting" to married women. *Bailey vs. Pearson*, 9 Foster, 94; *Merrill vs. Smith*, 37 Maine, 394; *Swift vs. Luce*, 27 id., 286; *Howe vs. Williams*, 34 id., 572; *Fuller vs. Bartlett*, 41 id., 243. See also *Wooster vs. Northrup*, 5 Wis., 245. The present cases are distinguished from *Conway vs. Smith*, 13 Wis., 125, in this, that *Mrs. Lee's* separate estate has not been benefitted by her separate trading. The creditors are not without remedy. They can sue the husband. He knew of and assented to her carrying on the business.

May 15.

*By the Court*, DIXON, C. J. Before the case of *Yale vs. Dederer*, 22 N. Y., 450, it was well settled in New York, if in fact anything can ever be said to be settled in that state, that a married woman having a separate estate, might bind

it *by her general engagements to pay debts contracted for the benefit of such estate, or on her own account, or for her benefit, upon the credit of it.* Meth. Epis. Church vs. Jaques, 3 Johns. Ch., 77 ; S. C., in Court of Errors, 17 Johns., 548 ; North Am. Coal Co. vs. Dyett, 7 Paige, 9 ; S. C., in Court of Errors, 20 Wend., 570 ; Gardner vs. Gardner, 7 Paige, 112 ; S. C., in Court of Errors, 22 Wend., 526 ; Curtis vs. Engel, 2 Sandf. Ch., 287 ; Yale vs. Dederer, 18 N. Y., 265.

In England a broader doctrine prevails. It has been decided that she may not only bind her separate property by a general engagement, written or parol, for her own benefit, or for that of the estate (Murray vs. Barlee, 3 M. & K., 209 Owens vs. Dickinson, 1 Cr. & Ph., 48), but that she can do so by the execution of a bond as surety for her husband (2 Atk., 69 ; 1 Bro. C. C., 16), and for a stranger even. 15 Vesey, 596. In Kentucky, her separate estate has been charged with the payment of a note executed as surety for her son, and parol evidence of her declaration, made at the time of executing it, that she would not pay it, and her separate property should not go for that purpose, was excluded. 7 B. Monroe, 293.

The courts of New York, however, have held to a narrower rule, and she has been restricted within the limits above stated. The rule as given by Chief Justice SPENCER, 17 Johns., and Judge COWEN in 20 Wend., is indeed somewhat less stringent, and accords more nearly with the English decisions. Chief Justice SPENCER says: " I am entirely satisfied that the established rule in equity is, that when a *feme covert*, having separate property, enters into an agreement, and sufficiently indicates her intention to affect by it her separate estate, when there is no fraud, or unfair advantage taken of her, a court of equity will apply it to the satisfaction of such engagement." Judge COWEN states it thus : " When her separate estate is completely distinct, and, as here, independent of her husband, she seems to be regarded in equity, as respects her power to dispose of or charge it with debts, to all intents and purposes as a *feme sole*, except in so far as she may be expressly limited in her powers by the instrument under which she takes her interest."

"The *feme covert*," says Chancellor WALWORTH, in *North American Coal Company vs. Dyett*, 7 Paige, 9, "is as to her separate estate considered as a *feme sole*, and may in person, or by her legally authorized agent, bind such separate estate with the payment of debts contracted for the benefit of that estate, or for her own benefit upon the credit of her separate estate." And again in *Gardner vs. Gardner*: "So far as that estate is concerned, she is considered a *feme sole*; and the estate is answerable for money borrowed by her or her trustee for the benefit of such estate, although the husband is the lender."

In the same case, in 22 Wend., Judge COWEN uses these words: "If the wife holds an estate separate from, and independent of her husband, as she may do in equity, chancery considers her in respect to her power over this estate as a *feme sole*; and although she is still incapable of charging herself at law, and equally incapable in equity of charging herself personally with debts, yet I think the better opinion is, that separate debts, contracted by her expressly on her own account, shall in all cases be considered an appointment or appropriation for the benefit of the creditors, as to so much of her separate estate as is sufficient to pay the debt, if she be not disabled to charge it by the terms of the donation." The vice-chancellor repeats the rule in 2 Sandf. Ch., by saying that the complainants, "in order to sustain their suit, must show that the debt was contracted either *for the benefit of her separate estate*, or for her own benefit *upon the credit of the separate estate*."

The rule as last laid down is fully and explicitly sanctioned by the two judges delivering opinions in *Yale vs. Dederer*, 18 N. Y. The case there turned on the ground that the liability of a surety is *stricti juris*, and equity will not grant relief where there is no obligation at law. Mrs. Dederer signed the note as surety for her husband. At law the note was void. She had executed no instrument creating a specific lien on her separate estate which would have been *legally* binding in case she had been a *feme sole*. In equity it was a mere general engagement, which could only be enforced upon principles of exact justice, and be-

cause it was against conscience for her to refuse payment.
This element was entirely wanting. It was clearly not
the case of a debt contracted on her own account for her
own benefit, or for the benefit of her estate. This is Judge
Comstock's position. That of Judge Harris is substan-
tially the same, though he treats it more as a question of ev-
idence. He holds that the fact of her engaging generally in
conjunction with her husband to pay money, is not sufficient
evidence of an intention to charge the separate estate—
that the presumption is, the debt is that of the husband, and
unless the contrary be shown the claim must be denied.

This ground of decision was the same when the case was last
before the court, but the judge who wrote the opinion was not
content to rest it there. He must go further and upset all
the law upon the subject, leaving scarce one stone upon an-
other of the edifice as it had come from the hands of the
courts and the profession after near two hundred years of
earnest thought and labor. What the rule of that state now
is, nobody can tell. The next wave in the tide of innova-
tion may sweep away the little that is left of established law.
It may perhaps be regarded fortunate by some, that the leg-
islature, as is suggested toward the close of the opinion, have
taken the subject in hand to regulate the rights of parties
respecting it. The learned judge gives strong evidence of
being for once in his life the very opposite of Lord Eldon,
who is said to have been "much more in the habit of doubt-
ing than overturning judgments." He doubts not at all,
but proceeds directly to the work of destruction.

I would gladly have avoided all comments on this case.
My patience has been so tried in considering it, that I fear I
cannot give it an impartial examination—that I may deal
unjustly by a learned judge whose candor and ability have
uniformly demanded my highest respect. I feel that he has
done himself great injustice—that he has given away to a
spirit of disingenuousness and cavil, which seems every-
where to pervade the opinion. But accustomed as we have
been, and still are, to look to New York for precedents wor-
thy of our imitation, both in legislation and judicial decis-
ions, counsel for the respondents have pressed the case upon

January Term,
1862.

Todd
v.
Lee et al.

our consideration as one of almost absolute and unquestionable authority. They insist upon it as a triumphant vindication of the correctness of the orders below, and if it be sound in principle it cannot be denied that they are right. Under these circumstances it will naturally be expected that we should give it a more extended consideration; and at the risk of being tedious, we will endeavor to do so in the fewest words at our command.

Before proceeding to the faults, as we regard them, we may properly observe that the opinion has one very great merit. The learned judge approaches his subject under no color of friendship. He is an open and undisguised enemy. He avows his revolutionary purposes frankly and boldly, and goes at once behind all authority and precedent—asking no support from the books, and referring to them only to expose what he considers their greatest errors and inconsistencies.

If the same frankness had been preserved throughout—if he had given the same measure of justice to those who went before him, that we have accorded in pointing out his chief excellence—had he not perverted the decisions, unintentionally perhaps, to suit his own purposes, and placed the courts in attitudes they never chose to occupy, the task would have been less laborious and far more pleasing.

His position is in short this: A married woman possessed of separate property under the statute, cannot bind it in equity for the payment of any debt contracted by her, unless it be a debt incurred for the direct benefit of the estate itself, without the formal execution of an instrument *specifically appropriating, or disposing of,* the estate to that purpose in such manner as to subject it to an actual charge or lien. The *jus disponendi* is not denied. She may charge her estate with the payment of her own debts, or those of another, just as she pleases; but to do so, in either case, she must execute some agreement, or perform some act, which at law would amount to a mortgage or pledge in case she were a *feme sole.* It will be seen at once that the learned judge sticks in the bark—that it is to be a revolution without cause or reason, inaugurated to effect a change in mere matters of form. No

additional guards are to be thrown around her estate, no new

indemnity gained, but a ceremony is to be observed not before supposed necessary. To accomplish this very desirable reform, she must submit to new and very serious burdens and inconveniences, considerably impairing the value and usefulness of the estate. If she wishes to effect a small loan, or purchase some article of necessity or comfort, and has not the money to pay, a conveyancer must be employed and a mortgage of the lands executed, or her personal property put in pledge, before she can be safely trusted. She must be deprived of one of the principal advantages arising from the ownership of property in all commercial countries, the privilege of obtaining, if need be, a general credit on the faith of that property.

To prove that this is or ought to be the law, the learned judge begins by asserting that "the universal '*jus disponendi*' was the sole and only foundation of the right in question," and that "no other basis has ever been suggested for it." So untrue is this in point of fact, that the cases where it has been sustained as an exercise of the disposing power are so few as scarcely to constitute an exception to the great number in which it has been placed on an entirely different ground, namely, that a married woman possessed of a separate estate, is, as to all matters pertaining to such estate, except as she is expressly limited by the instrument creating it, regarded in equity as a *feme sole*, and may charge or affect it by any act or contract which would be binding at law if she were unmarried. Not that she can bind herself personally, nor that the engagement is an execution of her power to dispose of the property and constitutes a lien upon it; but that it is one of the inherent qualities of the estate itself —an incident annexed to it as common to property in general, and necessary to its full enjoyment—that the owner may contract debts to be paid out of it, for which equity, in default of process at law, will, under proper circumstances, give execution in case payment be not made. This is the doctrine both of the earlier and later English decisions, and it is only in a few cases, not much discussed, before Lord LOUGHBOROUGH and Sir JOHN LEACH, vice-chancellor, that it

is spoken of as an appointment or the execution of a power. It *was* also the doctrine of the courts of New York, as will be seen by the quotations already made.

"In the earlier cases, indeed," says Judge STORY (2 Eq. Jur., § 1401), "the doctrine was put upon the intelligible ground, that a married woman is, as to her separate property, to be deemed a *feme sole;* and, therefore, that her general engagements, although they would not bind her person, should bind her separate property." In *Norton v. Turvill,* 2 Pr. Wms., 144, decided in 1723, Sir JOSEPH JEKYLL, Master of the Rolls, who had great reputation as an equity judge (4 Lives of Lord Chancellors, 415), said : "All the separate estate of the *feme covert* was a trust estate for the payment of debts." *Standford v. Marshall,* decided in 1740, and *Clerk v. Miller* in 1742, both in the time of Lord HARDWICKE (2 Atk., 69, 379), are entirely silent on the subject of appointment. The former was the case of bonds executed for money lent the husband ; and the latter of a parol promise by the wife to pay workmen for labor performed in the husband's house. And as observed by Lord BROUGHAM in *Murray v. Barlee* (3 M. & K., 9), the still earlier case of *Kenge v. Delavall,* before Lord Keeper GUILFORD in 1685 (1 Vern., 326), "makes no mention of such a distinction, for their being indebted generally is all that is stated as grounding the claim."

"The rule of this court is, that when anything is settled to the wife's separate use, she is considered as a *feme sole;* may appoint in what manner she pleases ; and unless the joining of her trustees with her is made necessary, there is no occasion for that." Lord HARDWICKE in *Grigby v. Cox,* 1 Ves. Sen., 517 (*Anno* 1750.) "It is common that by agreement between husband and wife, she has some separate estate left her for her disposal, as pin-money, which she may not only use, but by contract may dispose of what arises out of her pin-money as a *feme sole.*" Same in *Peacock v. Monk,* 2 Ves. Sen., 170. (*Anno* 1750.) Sir R. P. ARDEN, afterwards Lord ALVANLY, Master of the Rolls in the time of Lord LOUGHBOROUGH, and of whom it is said that by far the best judgments given in the court of chancery during that period were by him (6 Lives Ld. Chancellors, 204), speaking of *Hulme v. Ten-*

*ant* in *Sackett v. Wray*, 4 Bro. C. C., 484, says : " From that case I extract this principle, that a married woman may in this court be considered as to all her property as a *feme sole ;* I say as to her property, because no contract can be entered into by her to affect her person ; the remedy must be against her property ; with respect to her person she is protected."

Of the modern English decisions, *Murray v. Barlee* and *Owens v. Dickinson* may be referred to as fully establishing the same principle. To these many others might be added, but they are deemed sufficient to utterly refute the statement that no other basis than the *jus disponendi* has ever been suggested for the right.

And as to *Hulme vs. Tenant*, 3 Bro. C. C., 16, upon which comment is made, it is clear that the learned judge labors under a very great mistake. It is an authority directly in favor of the doctrine as it was previously understood. Lord THURLOW's difficulty was not as to the wife's capacity to bind her personal property and the income of her real estate by general engagement, for about that he had no doubt. He concludes the opinion by saying : " I have no doubt about this principle, that if a court of equity says a *feme covert* may have a separate estate, the court will bind her to the whole extent, as to making that estate liable to her own engagements, as, for instance, for payment of debts &c." The trouble was, as to the kind of relief which should be given. The estate consisted in part of a freehold interest in lands vested in trustees. The wife had joined the husband in the execution of a bond for money borrowed in part by herself, and in part by him. The bill prayed a sale of the estate, to satisfy the debt. No mortgage or other specific lien having been given, the inquiry was into the nature of the relief to be afforded. The proceeding was analogous to a personal action at law, where execution was confined to the goods and chattels of the debtor, and the annual profits of the land as they arose. Bac. Abr., Tit. "Execution," (A). In *Dundas vs. Dunters* 1 Ves., 196, he refused to apply stock to satisfy creditors, on the ground that it could not be taken on a " *Levari Facias.*" And in *Nantes vs. Carrock*, 9 Ves., 182, Lord ELDON refused to direct an assignment of stock for the same

reason.  Lord THURLOW says:  "The question is, what sort of execution this court will award against that separate property."  It is in the discussion of this that he uses the language quoted by the judge as applicable to the question at large.    If that be not perversion of authority, then I am at a loss to know what is.  The lord chancellor held that the estate could not be sold, but that the debt must be paid out of the rents and profits.

We are suprised at the reference to *Fettiplace vs. Gorges,* 3 Bro. C. C., 8, before Lord THURLOW, in 1789.  No question of the power of a *feme covert* to charge her separate estate with the payment of general debts was there involved. It was as to whether she could *dispose* of her personal estate by *will,* and Lord THURLOW held that she could, placing it on the *jus disponendi,* which nobody ever doubted.  And our surprise is not diminished by the manner in which the cases of *Norton vs. Turvill* and *Standford vs. Marshall,* decided the one upwards of sixty, and the other nearly fifty years before, are connected with this, as if they were most unwarrantable departures from the doctrines established by it.

It seems to us, also, that Chancellor KENT is made to contribute too strongly to the judgment.  The chief point in debate with him (3 Johns Ch., 85), and that out of which much of the conflict in the English courts had arisen, was as to the wife's power of disposition beyond the policy and intention of the settlement.    He contended that she was limited according to the terms of the deed, and that the intention of the settler, as collected from the whole instrument, was in all cases to govern.    If the object evidently was to make permanent provision for her support, by allowing her from time to time to receive and dispose of the income, she could not *anticipate,* or make a sweeping disposition so as to deprive herself of the estate, and if a mode of disposition was prescribed, she was confined to that, and could not adopt another.    *Expressio unius est exclusio alterius.*    There was much confusion and uncertainty in the English decisions.  In some cases, the intention of the settler had been entirely neglected, and the purpose of the estate defeated.  In others, it had

been more regarded, and her powers restrained so as to give it effect. In others still it had been held, that she could not be restricted, unless by express words. The chancellor reviewed them with that accurate learning and wise discrimination which characterize all his productions, making a most powerful argument in support of his own views, which, under the circumstances, he felt at liberty to adopt as the law of the case. The settlement he was considering prescribed the mode of disposition, to be by deed or will, and he held that a parol disposition could not be shown. He was overruled, however, and the judgment reversed by the court of errors (17 Johns., 548), on the ground that the wife's disposing power could not be restricted, except by *negative* words limiting her to the mode prescribed by the instrument under which she acquired her interest. Commenting on the observation of Sir WM. GRANT in *Wagstaff vs. Smith* (9 Vesey, 520), he says: " The principle admitted in these remarks, that the *intention* of the instrument of settlement is to prevail, is solid, and it is all we contend for;" and he closes with these words : " Perhaps we may say, that if the instrument be silent as to the mode of exercising the power of appointment or disposition, it is intended to leave it at large, to the *discretion and necessities* of the wife; and this is the most that can be inferred." This language by no means indicates that the chancellor was of opinion, in such a case, that the wife could not bind her estate by parol or other general engagements to pay debts necessarily incurred to supply her own wants. If this be true of estates in equity, vested in trustees, it would appear to be more especially so of an estate at law, vested in herself, as to which she is clothed with all the attributes of absolute dominion and ownership incident to property in general, unfettered by remainders or future provisions for herself or children. It would seem, therefore, that the present is not the time to go backwards in the rules of construction, as to her powers, when the legislature is moving so rapidly in an opposite direction. Subsequently, in his Commentaries (Vol. 2, p. 164), he gives the rule thus : " It is the settled rule in equity, that a *feme covert*, in regard to her separate property, is considered a

*feme sole,* and may by her contracts bind such separate estate."

The validity of contracts for the payment of money came but incidentally under consideration in *Bolton vs. Williams,* (2 Vesey, 138), and LORD LOUGHBOROUGH goes into no explanation of the previous cases upon that subject. The case turned upon a very different principle, namely, that equity will not, as against a *feme covert,* imply a promise to pay in the absence of a direct agreement. The annuities were void under the statute for want of proper memorials, and Mrs. Williams had made no promise to refund the money. Something also was said about the annuitants having a remedy at law to recover it back. This is the explanation given by Lord ELDON in *Jones vs. Harris* (9 Ves., 486), who, as the attorney general, was counsel for Mrs. Williams. He says he resisted the doctrine that her separate property could be made liable upon an implied *assumpsit,* and execution given out of it for money which she did not intend to charge, and that the lord chancellor held that an equity he could not enforce. The transaction being annuity, if it could not be maintained as such, the fault was that of the creditor himself; it was for him to have taken care to make the charge available, and if it failed the court would not grant relief at his suit. Equity would not assist him to a charge which she did not intend to give, or he to have, &c. This doctrine has since been seriously questioned. See note to *Aguilar vs. Aguilar,* 5 Mad., 415, and Judge COMSTOCK'S opinion in *Yale vs. Dederer,* 18 N. Y.

We fail utterly to perceive the alleged discrepancies in the reasoning of Lord BROUGHAM and Lord COTTENHAM. Their views seem to us to be in harmony and to stand well together. They reach the same conclusion by slightly different, but not inconsistent modes. After noticing that the existence of the wife is merged in that of the husband at law, Lord BROUGHAM says: " But in equity the case is wholly different. Her separate existence, both as regards her liabilities and rights, is here abundantly acknowledged ; not, indeed, that her person can be made liable, but her property may, and it may be reached through a suit instituted against

herself and her trustees." Lord COTTENHAM says: " Accord-
ing to that view (*Hulme vs. Tenant*), the separate property
of a married woman being a creature of equity, it follows
that if she has a power to deal with it, she has the other
power incident to property in general, namely, the power of
contracting debts to be paid out of it ; and inasmuch as her
creditors have not the means at law of compelling payment
of those debts, a court of equity takes upon itself to give ef-
fect to them, not as *personal* liabilities, but by laying hold of
the separate property as the only means by which they can
be satisfied."

January Term,
1862.

TODD
v.
LEE et al.

We do, however, think that we can see and appreciate
very great inconsistencies in the reasoning of the judge. He
denies that parol evidence can be received to explain or
qualify the contract so as to charge the separate estate, or
that any claim can be enforced which does not, by force of
the contract, constitute an actual lien, and insists that a note
or bond has no such effect. And yet he admits that every
debt incurred for the direct benefit of the estate itself, in
whatever form contracted, is obligatory, and claims that it
becomes a lien. " If contracted for the direct benefit of the
estate itself, it would of course become a lien upon a well
founded presumption that the parties so intended, and
in analogy to the doctrine of equitable mortgages
for purchase money." This is his language. If this
be not pushing the analogy beyond reason, and a
direct recurrence to the exploded doctrine of appointment,
then we do not understand it. If the separate property of a
married woman be a farm, and it becomes necessary for her
to purchase utensils or a team to till it, and she does so, giv-
ing her bond, note, or parol promise to pay, such bond, note
or parol promise becomes a *lien* or *mortgage* on the farm,
upon the *well founded* presumption that she so intended.

But again, how is the court to ascertain in such cases, that
the contract was made for the benefit of the estate, without the
admission of parol evidence ? The note or bond does not
disclose that fact. According to the theory of the case, if
the thirty-eight cows had been needed and purchased to
stock one of Mrs. Dederer's farms, her separate estate would

have been liable notwithstanding her husband had joined her in the execution of the note. How would the court have found that out without the aid of extraneous evidence? If the presumption is, when, the wife executes a note or other contract for the payment of money, together with her husband or a stranger, that it was for the debt of the latter, then extrinsic evidence must be admissible to repel that presumption. For the fact may be that it was for her debt, incurred for the benefit of her property, and that her husband or the stranger signed as surety, in which case her estate would be answerable. If there be no such presumption, still the evidence must be received, to show whose, in reality, the debt was, and so to discharge her estate in case she was surety. And how, if she engages alone, can the evidence be excluded, when the question of lien and presumed intention depends entirely upon it? It would seem that it cannot, and that it is no infringment of general rules. There are many cases, both at law and in equity, between principal and surety, parties to commercial paper, and others, where parol evidence is received to show the real nature of the transaction, and to change or modify apparent rights and liabilities.

We have now done with the case of *Yale vs. Dederer*, and for the rest can soon dispose of the questions involved in these appeals.

The contracts of a married woman, when necessary or convenient to the proper use and enjoyment of her separate estate, are binding at law. *Conway vs. Smith*, 13 Wis., 125. All her other engagements stand as before the passage of the statute, good only in equity. The change from an equitable to a legal estate, has not, with respect to them, enlarged her powers or removed the disability of coverture; but she remains as if still possessed of an estate in equity, without restriction as to her power of disposition. *Idem*; *Wooster vs. Northrup*, 5 Wis., 245 ; *Yale vs. Dederer*, 18 N. Y., 262. The debts in question belong to the latter class.

Within all the authorities, the separate estate of a married woman will be charged in equity with the payment of debts contracted for her benefit. In this case we need not inquire

further, for that the debts in question were beneficial to *Mrs. Lee* will readily appear. With the acknowledged consent and approbation of her husband, she engaged in business as a sole trader, the profits to be appropriated to her separate and exclusive use. She contracted these debts in the prosecution of that business. It is an established rule in such cases, that the earnings of a trade thus carried on, will in equity be deemed her separate property, and that she will be protected in its use, as against her husband, though not his creditors. 2 Story Eq. Jur., §1387; 2 Roper on Husb. and Wife (30 Law Lib.), 171–2; *Slanning vs. Style*, 3 Pr. Wm's, 334; *Megrath vs. Robertson*, 1 Dess., 445; *Kee vs. Vasser*, 2 Iredell Eq., 553; *Freeman vs. Orser*, 5 Duer, 476. See also *Gore vs. Knight*, 2 Vernon, 535; and *Gage vs. Lister*, 2 Bro. Cases Parl., 4. This is a sufficient consideration of benefit to charge her property with the payment of debts incurred in the business.

If the agreement for a separate trade be by articles before marriage without trustees, or if after, and founded upon a valuable consideration, the income and profits will be supported for her separate use against her husband or his creditors. But if, after marriage, he merely permit her to conduct business on her separate account, the earnings will be protected only as against him. Story's Eq., *supra*. In such cases a court of equity will make him a trustee for her separate use, and compel him to account to her, or her creditors for the profits which may come to his hands. Roper on Husband & Wife, *supra*.

But while the beneficial interest of the wife is thus recognized and enforced in equity, her condition at law is very different. There the profits, as well as the capital employed, are the husband's, there being no trustees, no obstacle to interpose between the rule of law which vests in him all the wife's personal property accruing to her during the marriage, and her equitable title to it as her separate estate under the permission of her husband. Roper, *supra*. And he is also, upon the ground of his presumed authority to her, bound by her transactions in the trade and responsible for the debts. *Idem.* This answers many of the authorities cited by re-

spondent's counsel, and shows them inapplicable.   They were cases at law, in which property thus employed was held liable to seizure and sale to satisfy the husband's debts. They prove nothing here.   These are proceedings in equity to charge the separate estate, on the faith of which the credits were given; and if it is admitted that the goods, when purchased, might have been taken for *Mr. Lee's* debts, that does not affect the decision.   It was one of the hazards to be considered by *Mrs. Lee* before embarking in the enterprise.   The great length to which the common law goes in denying the separate rights of the wife, is illustrated by the following cases: The property in wearing apparel bought for herself by a wife living with her husband, out of money settled to her use before marriage, and paid to her by the trustees of the settlement, vests by law in the husband, and it is liable to be taken in execution for his debts.   *Carne vs. Brice*, 7 M. & W., 183.   A husband and wife separated by agreement (not under seal), and at that time he agreed to allow her a certain sum weekly for her support, which was paid; and she saved a portion of her allowance and invested it in stock; but a few days before her death she sold out the stock, and disposed of the proceeds by way of *gift*.   *Held* that the husband was entitled to recover back the money so given, in an action for money lent, against the person who received it.   *Messenger vs. Clarke*, 5 Exchequer, 388.   A married woman deposited with the defendant the saving of certain rents of leasehold property, which had on her marriage been conveyed by her, with the consent of her intended husband, to trustees, upon trust to pay or permit her to receive the rents &c. to her sole and separate use.   *Held*, that the trust being discharged on the rents coming to the wife's hands, the trustees ceased to have any interest in or control over them; and that upon the wife's death, her husband was entitled to bring an action in his own right to recover the money so deposited.   *Bird vs. Peagram*, 76 E. C. L., 638.

How far the introduction of legal instead of equitable estates, and the authority to the wife at law to hold and dispose of personal property which comes to her as separate estate, may be considered *in equity* as having relaxed this

strict rule of the common law, so as to enable that court to protect her against the demands of the husband's creditors in cases like these, where her separate legal estate is absorbed in the trade, or whether they have affected it at all, need not be here examined. No claim on the part of *Mr. Lee's* creditors, if there be any, has been interposed, and it is now too late for them to proceed. Nor need we inquire how far equity would interfere in behalf of her creditors against his, since the former, by superior diligence, have acquired actual precedence. The moral force of a rule which would assist them to the products of a business built up by their indulgence, would appear to be almost irresistible.

Neither are we to investigate *Mr. Lee's* personal liability. No demand for personal judgment is made against him. Nor does it seem there could be. As a trustee, in equity, he is a proper party, but his personal liability, whatever it is, is legal and must be enforced at law. The husband is liable upon the contracts of his wife, only upon the principle of agency—that he has authorized her, either expressly or by implication, to bind him, the general rule being that she has no such power. 1 MacQueen on Husband and wife, 131 (57 Law Library, 93); *Freestone vs. Butcher*, 9 C. & P., 643 (38 E. C. L., 269); *Lane vs. Ironmonger*, 13 M. & W., 368. And whether she was authorized or not is a question of fact for the jury. *Idem.* In determining it, many circumstances are to be considered, as whether the contracts are extravagant (*Lane vs. Ironmonger, supra*); whether the husband, having control of the goods, does not cause them to be returned. (*Waithman vs. Wakefield*, 1 Camp., 120); and whether the credit was not given solely to the wife, when, it is said, the husband will in no case be liable. *Freestone vs. Butcher, supra*; *Bentley vs. Griffin*, 5 Taunt., 356 (1 E. C. L., 131); *Metcalfe vs. Shaw*, 3 Camp., 22. Mr. Roper thinks that wherever the wife is to be considered as acting as a *feme sole*, and entitled to the profits of her separate trade, as her sole and separate estate, the husband will not be liable *in equity* to her engagements contracted in it; that the creditor cannot complain, since he trusted to *her* credit only, and it would be unjust to subject him to her debts, when he is not entitled to any of

the profits; and that a court of equity will interfere to prevent the prosecution of the legal right and at the same time subject the funds in the trade to the demands of her creditors. 2 Roper, 174. But these positions are doubted by Mr. Jacob and Mr. Bright (2 Bright on Hus. & W., 301), and seem never to have been adjudicated.

The issuing of the injunction and appointment of the receiver in these cases, was, under the circumstances, undoubtedly correct. They take the place of the process of attachment, when necessary and proper in actions at law. Such was the practice under the former system in equity, when there were no trustees of the separate estate, and the fund was in danger of being wasted or put beyond the reach of creditors. It was the course pursued by the bill in *Lillia v. Airey*, 1 Vesey, 277, and in *Meth. Epis. Church v. Jacques*, 1 John. Ch., 450; and instances of an injunction where there were trustees are very numerous.

It follows from these views, that the orders dissolving the injunctions, and vacating the orders appointing a receiver in the three first entitled causes, and the judgments in the two last, must be reversed and that all must be remanded for further proceeedings according to law.

Our investigations have prompted us to a suggestion upon a point not agitated by counsel, and that is, whether all these actions (for we perceive by the record that there are not less than seven) ought not to be consolidated into one, in the nature of a suit in behalf of all the creditors of the separate estate; otherwise, whether that should not have been the form of proceeding in the first instance. In *Anonymous*, 18 Vesey, 258, it was held that all the debts of a married woman must be paid equally—that a creditor by bond had no priority over simple contract creditors. That, however, was a case of administration of assets after her death. But in *Owens vs. Dickinson, supra*, it is said generally, that if a married woman enter into several agreements of a general nature, and all the parties come to have satisfaction out of her separate estate, they are paid *pari passu*; and a discussion having arisen at the bar as to the force of the decree, Lord COTTENHAM, at the close of the report, makes some remarks upon the rights

January Term 1862.

TODD
v.
LEE et al.

of creditors in such cases, that they may contest the claims of each other, having a common interest in the fund, &c. The bill in that case was filed in behalf of the complainant and the other unsatisfied creditors, but that too was a proceeding against trustees and executors, after the death of Mrs. Jones. But in the case of the *Coal Co. v. Dyett* (2 Edw., 115; 7 Paige, 9), and *Curtis v. Engel* (2 Sand. Ch., 287), in New York, which were proceedings like the present against the husband and wife to subject her separate estate to the payment of her debts, the bills were by one creditor in behalf of all others having similar claims, who might think proper to come in under the decree. In the early case of *Norton v. Turvill, supra*, it was declared to be a *trust estate* for the payment of debts, and seems to have been uniformly so treated by the courts ever since. It is very well known that there are many cases in equity, particularly among creditors of a common debtor having the same or a similar interest, where one may and indeed must bring suit on behalf of himself and all the others; such as suits by creditors of a deceased person against his representatives for an account and application of his assets; creditors' bills to reach choses in action and property of the defendant which cannot be sold on an execution at law; actions by creditors where there are a number who are parties to a deed of trust for the payment of debts, and the like. Story's Eq. Pl., §§ 99 to 104, and notes, and § 157. Among the reasons given are, that it tends to prevent multiplicity of suits; renders the administration of assets more convenient, and less burdensome on the fund; enables the court to act fully upon its favorite maxim, that equality is equity; and obviates the danger of doing injustice to parties not before the court. It would seem that the reasons apply with full force to proceedings like the present —that the parties being without a remedy at law, and obliged to come into equity, the court will distribute the estate according to its own notions of right and justice. The proceeding very closely resembles the creditor's bill, and it would appear very hard that *Mrs. Lee's* separate property should be consumed with the expenses of these several actions, if one can be made to answer the same purposes.

January Term, 1862.

Todd
v.
Lee et al.

It is true that in New York the creditor who first files his bill obtains a preference, and that the filing of a bill by one creditor in behalf of himself and others, will not prevent another creditor from filing a similar bill. *Corning v. White*, 2 Paige, 567; *Jones v. Lansing*, 7 id., 583. But as soon as a decree is obtained in either suit, the proceedings in all others may be stayed, if no other relief can be obtained in them than under the decree already made; and the preference obtained is placed on the *provisions of the statute*. Idem. The rule in England and in those states where the action is not regulated by statute, seems to be different, and it is said that all the creditors, who choose to come in, must share alike. The subject is discussed at some length by Chancellor BLAND in *Strike v. McDonald*, 2 Harris & Gill, page 233, and it was there held that other creditors might come in, whether the original bill was filed in form in their behalf or not.

We have not examined these questions with that care which would be required, were we to express an opinion, which we will not do in advance of a hearing of the parties. It may be that no preference is claimed on account of priority of suit, or that it is conceded, and that no objection is or will be taken to the actions being prosecuted severally. We make these suggestions merely to excite the attention of counsel, that they may examine the subject and perhaps become mutually satisfied that the suits should be consolidated, and expense and trouble saved.

Orders and judgment reversed.

---

NOTE.—Chap. 95, R. S. 1858—" Of the Rights of Married Women "—contains the following provisions: "Sec. 1. The real estate, and the rents, issues and profits thereof, of any female now married, shall not be subject to the disposal of her husband, but shall be her sole and separate property, as if she were a single female. Sec. 2. The real and personal property of any female who may hereafter marry, and which she shall own at the time of marriage, and the rents, issues and profits thereof, shall not be subject to the disposal of her husband, nor be liable for his debts, and shall continue her sole and separate property. Sec. 3. Any married female may receive by inheritance, or by gift, grant, devise or bequest, from any person other than the husband, and hold to her sole and separate use, and convey and devise, real and personal property, and any interest or estate therein, and the rents, issues and profits, in the same manner and with like effect as if she were unmarried, and the same shall not be subject to the disposal of her husband, nor be liable for his debts."—REP.