# CHARLESTON.

## BRUFF *v.* THOMPSON.

(*WOODS, JUDGE, absent.)

Submitted June 9, 1887.—Decided February 18, 1888.

1. SEPARATE ESTATE—MARRIED WOMAN—PURCHASER.

In a suit in equity brought by a creditor to subject the separate personal estate of a married woman to the payment of a debt, in which no attachment was sued out, or lien acquired on the property prior to the institution of the suit, *held*, by two judges in a court of three, that, until the court takes the property out of the possession of the married woman, or the plaintiff acquires a lien upon it in some of the modes recognized by the laws of this State, a purchaser thereof for value and without fraud will not be liable to the plaintiff for the property so purchased or its value, whether such purchaser had or had not notice of the pendency of such suit at the time of his purchase ; and, by one of said judges, that the plaintiff, from the time his summons is served on the woman,

---

*Counsel below.

acquired a claim or right to subject said property as against all the world, and that the pendency of the suit is sufficient to charge a purchaser, without regard to whether he has or has not in fact notice of the pendency of the suit.

2. APPEAL—DECISION—CONCURRENCE OF JUDGES.

Under our State Constitution, § 4, art. VIII, the decision in this case is not binding authority in any other case, because not concurred in by at least three judges.

*T. A. Bradford* for appellants.

*Samuel V. Woods* for appellees.

SNYDER, JUDGE:

Bruff, Faulkner & Co., on March 16, 1883, filed their bill in the Circuit Court of Barbour county against Helen M. Thompson and others, alleging therein that the said Helen M. Thompson was a married woman, the wife of John P. Thompson; that she was indebted to them by note to the amount of over $800.00; that she was the owner of certain real estate in the town of Philippi, which was incumbered by vendor's and trust liens for a considerable sum of money; that she was also the owner of a stock of merchandise and other personal property, upon which they allege their said debt is a charge, as well as upon the rents and profits of said real estate; that the said John P. Thompson, her husband, is insolvent; that she owns all said property as her separate estate; and that she is engaged in selling and converting said merchandise, and other personal property, into money, and, unless the same is taken into the custody of the court, the said property or its proceeds will be placed beyond the reach of their demand before the same can be subjected, by ordinary legal process, to the satisfaction of said demand. They pray that the sheriff may be required to take possession of said personal estate, their debt declared to be a charge upon the rents and profits of the real estate, and that their debt may be paid, etc.

At February rules, 1885, the plaintiffs filed an amended bill, in which they allege that, after they had acquired a lien on the aforesaid personal property by filing their original bill, the defendants, J. N. B. Crim and James E. Heatherly, with full knowledge of the plaintiffs' lien, purchased said property from their debtor, the said Helen M. Thompson;

that the value of the property so purchased by Crim was $607.00, and of that purchased by Heatherly was $400.00. They, therefore, in addition to the relief asked in the original bill, pray for decrees against said Crim and Heatherly, respectively, for the said sums of money.

The defendants, Crim and Heatherly, answered. The former admits that in February, 1883, he purchased of Mrs. Thompson goods of the value of $407.00, which were delivered to and paid for by him, and that he agreed to purchase other goods of the value of $200.00, which were never paid for or delivered to him; but he positively denies that he had any knowledge or notice of the pendency of the plaintiffs' suit, or of any lien on the property, at the time of his said purchase. The defendant, Heatherly, admits that in July, 1883, he purchased of Mrs. Thompson goods of the value of $200.00, and paid for the same, but only a part thereof, worth about $85.00, ever came into his possession,—the residue having remained in the possession of Mrs. Thompson; and he avers that his purchase was in good faith, without any notice of the pendency of the plaintiffs' suit, or any lien on the said goods. The proofs fully sustain the allegations of these answers, except that the evidence is contradictory as to whether or not Crim had notice of the pendency of the plaintiffs' suit at the time he purchased said goods from Mrs. Thompson.

On October 22, 1886, the court entered a decree, in which, after reciting that it appeared to the satisfaction of the court that Crim and Heatherly purchased said goods after the filing of the plaintiffs' original bill, and that the plaintiffs, by filing said bill, acquired a lien as of that date on the said property, it ordered and decreed that the said Crim do pay to the plaintiffs the sum of $736.62, being the said $607.00 and its accrued interest, and that the said Heatherly do pay to the plaintiffs the sum of $240.16, being the aforesaid $200.00 with its accrued interest. From this decree the said Crim and Heatherly obtained this appeal and *supersedeas*.

The important question presented on this appeal is: Did the plaintiffs, by the mere institution of their suit, acquire such a charge or lien upon the personal property of their debtor, Mrs. Thompson, as to make said property or its value liable for their debt in the hands of a

subsequent purchaser for value, either with or without notice of the pendency of the plaintiffs' suit? It is not alleged or pretended that there was any seizure, or attempt to take possession, of the property by the plaintiffs, under legal process or otherwise, or that there was any levy made upon it, or inventory taken of it, by any one.

The plaintiffs, in order to maintain the position that their simple contract debt became a lien upon the property of a married woman at the time of filing their bill, claim that their suit is in the nature of a proceeding *in rem ;* and, in support thereof, they cite and rely upon the decisions of this Court in the cases of *Hughes* v. *Hamilton,* 19 W. Va. 336, and *Howe* v. *Stortz,* 27 W. Va. 555. In neither of those cases was any question raised or considered by the court between creditors of the married woman and the purchasers of property from her after the institution of the suit. The portions of the opinions in those cases which are relied on here related simply and wholly to the question of priority among the creditors themselves; and in the latter of these cases it was decided that the debt of a general creditor of a married womam does not constitute a lien or charge upon her separate estate prior to the institution of the suit by such creditor; while in the former case it was decided that, in such suits, general creditors will be allowed priority of payment out of such separate estate between each other, according to the time or times of bringing their suits or filing their petitions to subject such property. It is true, in this case, the debt is called a *quasi* lien upon the separate estate ; and Haymond, Judge, in the opinion of the Court, says :

"This proceeding in equity to subject the separate estate of a *feme covert* to the payment of her just debts must, I think, necessarily be considered in the nature of a proceeding *in rem ;* and there is surely little difference in its nature between such proceeding and a proceeding by bill in equity against a non-resident debtor to subject his estate in this State to the payment of a debt when no attachment is sued out in the case. * * * In such proceeding, perhaps, all rights acquired from or under the *feme covert* to the separate property, sought to be subjected in this suit to the payment of the debt, pending the suit, are subject to any decree

which may be made in the suit, except so far as a purchaser
may be protected by section 14, ch. 139, of the Code, as
amended by chapter 68 of the Acts of 1877. In all other
respects the maxim, *pendente lite nihil innovetur*, applies;"
citing *Cirode* v. *Buchanan*, 22 Gratt. 205; and *Hughes* v.
*Hamilton*, 19 W. Va. 392.

The case here cited from 22 Gratt. was a foreign attach-
ment suit to subject real estate of a non-resident debtor to
the payment of the plaintiff's debt. Long after the suit had
been instituted, the debtor became a bankrupt, and his
assignee made himself a party to the suit, and, the land
having been sold, claimed the proceeds. The court held :
"The bill stating a good case for an attachment suit, the affi-
davit required by the statute may be made at any time be-
fore another obtains a right, and the indorsement on the
subpœna is not necessary to render his attachment valid;"
and therefore the plaintiff was entitled to the proceeds of
the land as against the assignee in bankruptcy. In the con-
clusion of the opinion, the court says "that, the said debtor
having become a bankrupt long after the institution and
during the pendency of the suit, his assignee in bankruptcy
can stand on no higher ground in regard to said suit, and
the claim asserted therein, than the bankrupt himself, but
stands in his shoes, and is entitled only to his rights." 22
Gratt. 223. It is apparent that this case gives no countenance
to the claim that personal property of a married woman,
sold to a third person during the pendency of a suit to charge
it with a debt, is subject to the debt of the plaintiff. No
such question was raised or discussed either in this case or
the case of *Hughes* v. *Hamilton*, *supra*.

The statute referred to by Judge Haymond (section 14, ch.
139, Code; chapter 68, Acts 1877) provides that the pendency
of any action, suit, attachment, or proceeding to subject real
estate to the payment of any debt, "shall not bind or
affect the purchaser of such real estate unless" his *lis
pendens* is docketed, etc. It is immaterial, under this
statute, whether the purchasers has actual notice or
not of the pendency of the suit; for it declares that
the suit shall not affect any purchaser,—not simply a pur-
chaser without notice,—unless a *lis pendens* is docketed. If

such is the rule as to real estate, *a fortiori* it should not affect a purchaser of personal property in a case like this. The doctrine of *lis pendens* is harsh in its effect upon purchasers, and has always been confined in its operations to the necessities of the policy on which it is founded, and it is applied only to proceedings directly relating to the thing or property in question. It will not apply to an action of debt brought to ultimately charge land for its payment. *White* v. *Perry*, 14 W. Va. 66. The application of the doctrine seems to have been confined at common law to actions for the recovery of specific chattels, as in detinue, etc.; and in equity to suits brought to directly charge real estate. I doubt whether it now applies in any case in this State except to those in which our statute requires the *lis pendens* to be docketed. In ordinary actions at law for the recovery of a debt or damages, the plaintiff can obtain no lien on the personal estate of his debtor until his claim has been reduced to judgment, and an execution issued thereon, which is placed in the hands of an officer for levy. I can discover no reason or policy for making a suit against a *feme covert* to recover a debt an exception to this general rule. In the case at bar the property is not specifically described or identified; *per* sequence, if the claim of the plaintiffs is allowed, the *feme* can not sell a pin or a chicken, however small may be the debt of the plaintiffs or large her estate. Such a construction of the law would virtually destroy all the rights of that class of persons which the legislative policy of this State recognizes and protects.

It is claimed, however, that this is a proceeding *in rem*. If so, then the plaintiffs, according to the law governing such proceedings, have failed to do the very thing which would give them a lien on the property. The jurisdictional fact in such proceeding is the seizure and taking possession of the *rem* or property. That has not been attempted here, and therefore the plaintiffs not only have acquired no lien on the property, but they have acquired no jurisdiction over it. *Windsor* v. *McVeigh*, 93 U. S. 274.

But the plaintiffs contend that they have a lien on the *feme's* property by reason of the analogy of this proceeding to a suit by foreign attachment, and, in support of this con-

tention, rely upon certain expressions in the opinion in *Hughes* v. *Hamilton*, and especially the expression that this must "be considered in the nature of a proceeding *in rem*," and analogous to a "proceeding by a bill in equity against a non-resident debtor to subject his estate in this State to the payment of a debt, when no attachment is sued out in the case." 19 W. Va. 394. I can not understand what is meant by the concluding portion of this quotation; for I am sure that there is no proceeding in this State by which the estate of a non-resident debtor can be subjected to a debt, under any circumstances, "when no attachment has been sued out in the case." The judge who used that language was evidently misled by the opinion of the Court in *Cirode* v. *Buchanan*, 22 Gratt. 205. The opinion in that case, in some respects at least, contains very questionable law, as appears from the opinion of this Court in *Chapman* v. *Railroad Co.*, 26 W. Va. 299, 321.

But, admitting the correctness of the conclusion in *Cirode* v. *Buchanan*, it furnishes no foundation for the statement that there can be a suit to subject the estate of a non-resident without suing out an attachment. It was held in that case that there was a valid attachment. The proceeding by attachment is wholly statutory. It had no existence at the common law, and consequently any lien acquired by it can only be such as is directly conferred by the statute strictly construed. Our attachment law is found in the provisions of chapter 106, Code. It is there provided that the plaintiff can acquire a lien on the personal property of his debtor only by the levy of his attachment thereon, section 9, ch. 106, Code.

In the case before us there was not only no levy upon the estate of Mrs. Thompson, but there was no seizure of it, or process of any kind issued against it; so it is clear that the analogy between the proceeding here and that by attachment, in respect to the lien contended for by the appellees, has no existence whatever. It is elementary law that either in proceedings technically *in rem*, or in those in the nature of proceedings *in rem*, such as by attachment, etc., the plaintiff can acquire no lien upon the personal property against which the proceeding is taken unless there is a seizure or levy upon such property.

Without pursuing the subject further, my conclusion is that, in a proceeding in equity to subject the personal estate of a *feme covert* to the payment of a debt, in which the property is not seized, levied upon, or otherwise taken into custody, the plaintiff does not acquire any specific lien upon such property. Certainly, he acquires no such lien simply by the institution of his suit. This fact seems to be recognized in the frame of the bill in this suit, because the prayer is, unless the *feme* debtor, or some one for her, shall give bond to answer the decree of the court, that the sheriff be required to take possession of the property sufficient to satisfy the plaintiffs' demand. If this had been done, or, perhaps better, if the plaintiffs had obtained an injunction, and had the property put in the hands of a receiver, there can be little doubt that the proceedings would have been sustained, and the plaintiffs' suit thus made effectual. *Lillia* v. *Airey*, 1 Ves. Jr. 277; *Todd* v. *Lee*, 15 Wis. 384; *Church* v. *Jaques*, 1 Johns. Ch. 450. But this was not done in this case.

It seems to me clear that until the plaintiff, in a suit of this character, in the manner suggested, takes the property out of the possession of the *feme*, or acquires a lien upon it in some of the modes recognized by law, a purchaser thereof, for value and without fraud, will not be liable to the plaintiff for the property so purchased, or its value, whether he had or had not notice of the pendency of the suit at the time of his purchase.

For the foregoing reasons, I am of opinion that so much of the aforesaid decree of October 22, 1886, as requires the appellant, Crim, to pay to the plaintiff $736.62, and the appellant, Heatherly, to pay to them $240.16, and all portions of said decree affecting the appellants in any manner, must be reversed.

------

GREEN, JUDGE, dissenting:

The question involved in this case is whether in a chancery suit to subject the personal estate of a married woman to the payment of a debt, the plaintiff acquires a specific lien or claim upon the personal property of the married

woman named in the bill, by the service of the summons on her and afterwards filing his bill, or whether such specific lien or claim is only acquired by the taking possession of the property by the sheriff, or some one else, under an order of court in the cause.

To determine this question we must have a clear conception of the true character of such a suit in equity. It is a suit brought to enforce what Pomeroy, in his excellent work on Equity Jurisprudence, calls an equitable primary right, as distinguished from a legal primary right; and all equitable primary rights are rights relating to property, and in no case are they rights relating to persons, though, in two or three special cases, statutes have expressly conferred on courts of equity, by special and prescribed proceeding, the power to determine a few rights relating to persons; such as whether a person is a lunatic, and the power to divorce. But these do not belong to the equity jurisdiction as such, but are simply statutory remedies, whereby rights relating to persons are in these few specific cases conferred on courts of equity; though in their nature being rights relating to persons, they, but for such statutes, could never have been acted on by courts of equity. See 1 Pom. Eq. Jur., pp. 81, 82, § 98.

This equitable primary right, which such a suit as the one before us is brought to enforce, belongs also to that small class of such rights which are not only different from and additional to legal primary rights, but are in direct conflict with them,—a right which a court of equity admits and upholds, which, under the same state of facts, the law courts not only refuse to recognize, but which they would deny and oppose. Id. p. 83, § 101. In section 104, p. 86, he says:

"Another remarkable example of equitable primary rights, in direct conflict with those created by law, under the same facts, is shown in those contracts of married women which are treated as valid and enforced in equity. By the common law every agreement of a married woman was simply a nullity,—not merely voidable, but absolutely void. Equity did not in a direct manner abolish this legal dogma. It did, however, in cases reached by its doctrine, create a primary right and duty from the contract, which, being violated, it

enforced in its own manner, and by its own peculiar remedy. So far as equity went, there was then a direct antagonism between its rules and those of law. The law said most peremptorily that no right or duty arose from the transaction. Equity said the contract was the occasion of a full right and duty of performance; and, although in deference to the common law, it did not enforce the duty against the wife personally, it enforced it against her separate estate, upon which it was a charge."

These fundamental principles remain in full force in this State, being entirely unaffected by our married woman's act, (chapter 66, Code 1887, p. 605.) See *Stockton* v. *Farley*, 10 W. Va. 171; *Carey* v. *Burruss*, 20 W. Va. 571; *Radford* v. *Carwile*, 13 W. Va. 572. These and many other cases show that a married woman can not make any contract which a court of law will in this State recognize as creating any obligation on her, or as having any effect whatever. If a common-law judgment against her was rendered on such contract, it would be absolutely null and void. *Tavenner* v. *Barrett*, 21 W. Va. 658; *White* v. *Manufacturing Co.*, 29 W. Va. 385, 1 S. E. Rep. 572. But, if she create a debt by contract, a court of equity regards it as imposing on her a primary obligation, which will be enforced by subjecting her personal property held by her as her separate estate, whether under a conveyance made prior to the passing of our married woman's act, or out of her personal property held by her under our married woman's act.

The extent to which her real estate held as her separate property can be subjected, I need not define, as it is foreign to the case before us; but her personal property, held by her as her separate estate, will be sold by a court of equity, in a suit brought against her by her creditor to pay such creditor, just as it always would have been sold by a court of equity; this being a means or remedy which a court of equity has always adopted of enforcing this primary equitable right arising from her contract creating the debt, though this contract always was, and still is in this State, held to be null and void in a court of law. But, following the established law as laid down by Pomeroy in the quotation above from his work, a court of equity in this State would not render

against a married woman a personal decree for her debt. See *Hughes* v. *Hamilton*, 19 W. Va. 366, tenth point of syllabus. And in all this we have but followed the recognized principles of a court of equity, as laid down in the above quotations from Pomeroy's work. They are fundamental and unquestioned law in this State.

This chancery suit, brought by a creditor of a married woman having a separate estate, to subject her personal property, sold by her as her separate estate, to his debt, created by a contract made by her with him, recognized in a court of equity, but regarded as void in a court of law, is of course a suit brought to enforce a primary equitable right, and is of the same character as any other chancery suit brought to enforce any other primary equitable right.

Of this sort of suits many examples might be given; for instance, a suit in equity to enforce specifically a verbal contract for the sale of land, which has been in part performed. Such verbal contract was held in the common-law courts always, and is still held, utterly void, though it had been in part performed; and the courts of law did not recognize, and do not now recognize, such verbal contract for the sale of land, though partly performed, as conferring on the parties to the contract any rights. Courts of equity, however, have recognized such verbal contracts, when partly performed, as valid contracts, creating a primary equitable right; as the contract of a married woman having a separate estate created a primary equitable right, though regarded as absolutely void at law. In both cases these primary equitable rights, created by these contracts, were enforced in courts of equity by appropriate proceedings; the one by specifically enforcing the contract by requiring the party who had thus verbally agreed to convey land, when the agreement had been in part performed, to convey the land to the person to whom he had sold it, or, if this could not be done by appointing a commissioner to convey such land to the purchaser; in the other, as we have seen, by directing the sale of the wife's separate personal property to pay the debt created by her contract.

Other examples might be cited; as, for instance, where A had bought land, and paid for it, but the deed was made to

B, this was recognized in law as the land of B, just as though he had paid for it; but a court of equity always and now holds that, under such facts, A has a resulting trust,—a primary equitable right, which a court of equity will enforce by requiring B or, if more convenient, a commissioner to convey B's legal title to the land to A. So a vendor's lien is utterly unrecognized by a court of law; but it is a primary equitable right, which may be enforced in a court of equity by a sale of land, or so much thereof as is necessary to pay the unpaid purchase-money. And so in the case of any other sort of equitable lien on either real or personal property. Such liens, when purely equitable, are totally unrecognized in courts of law; but, as they are primary equitable rights, they will be enforced in a court of. equity, precisely as the debt of a married woman being a primary equitable right is enforced, that is, by a sale of a sufficient portion of the property, on which this equitable lien exists, to pay the lien, or a sale of so much of the married woman's separate personal property, as would pay the debt, though in neither case would a court of equity render any personal decree against the owner of such property, that is, against the party who, by his conduct, had created the equitable lien, or against the married woman who had by her contract created the debt.

All suits of this character are obviously suits *inter partes*, having in view as one, or perhaps in some cases as the sole object of such suit, the establishment of a right to subject certain property to the payment of a debt, or setting up a claim to the ownership of the property, or some sort of right in connection with such property. The exact character of the claim against such property varies much, according to the nature of the primary equitable right claimed by the plaintiff. But till, in this controversy *inter partes*, he has established by evidence his primary equitable right, he can not have a decree in his favor of any kind.

Such suits are very different from proceedings *in rem*, as they are called. The following is the definition given in 2 Smith's Lead. Cas:, note, *Doe* v. *Oliver*, ( *Duchess of Kingston*'s *Case*,) side page 585, (top page 7th Amer. Ed. 622:) "A judgment *in rem* I conceive to be an adjudication pro-

nounced upon the *status* of some particular subject-matter by a tribunal having competent authority for the purpose." And he adds: "Such an adjudication, being a most solemn declaration, from the proper and accredited quarter, that the *status* of the thing adjudicated upon is as declared, excludes all persons from saying the thing adjudicated upon was not such as declared by the adjudication." See *Cammell* v. *Sewell*, 3 Hurl. & N. 617, 5 Hurl. & N. 728; *Simpson* v. *Fogo*, 29 Law J. Ch'y 657, and *Imrie* v. *Castrique*, 8 C. B. (N. S.) 405. This definition I find commonly adopted. See 7 Rob. Pr. 42; *Syester* v. *Brewer*, 27 Md. 313.

Where proceedings are *inter partes*, notice is served on the parties. When they are *in rem*, notice is served on the thing itself. This notice or taking possession of the thing by the court or its officer is regarded, in proceedings *in rem*, notice to all those having an interest in the thing, and they may make themselves parties, and appeal from the sentence. This is the character of notice in admiralty cases, which are strictly proceedings *in rem*. Thus, too, the notice in libel by seamen on board the ship is given by the marshal of the court seizing and actually controlling the ship. This notice, by actually seizing the ship in this manner, is necessary to give the court jurisdiction,—just as service of the summons on the defendant is necessary to give the court jurisdiction in suits *inter partes*. See *Taylor* v. *Carryl*, 20 How. 599. And so a district court has, under the act of Congress of July 17, 1862, no jurisdiction to condemn property, this being a proceeding *in rem* proper, until after the same has been seized. *Pelham* v. *Rose*, 9 Wall. 106. This must be so in proceeding strictly *in rem* and not *inter partes*, as it is this seizure of the property which constitutes the required notice to give the court jurisdiction; there being no party to the suit on whom notice can be served.

There has been some diversity of opinion as to whether a foreign attachment is a proceeding *in rem* or a suit *inter partes*. Chief Justice Marshall, in 1823, in *Mankin* v. *Chandler*, 2 Brock. 130, following the English decisions, held it was clearly not a proceeding *in rem*, but a suit *inter partes*, and therefore that a decree in such case is conclusive evidence only against the parties and privies. This, however,

has not been the universal holding of the courts; but it seems to me to be clearly sustained by the weight of authority. See 7 Rob. Pr. 46 *et seq.;* 2 Smith Lead. Cas. (7th Am. Ed.) side page 690, top page 840 *et seq.* But I regard them as immaterial questions, so far as this case is concerned; there being here a personal service of the summons.

Proceedings *in rem* proper in the United States arise much oftener in the Federal courts than in the State courts. They are principally in admiralty cases, and cases arising under seizures of property for violation of the revenue laws of the United States. The most usual proceedings *in rem* in this State are the proceedings whereby wills are usually admitted to probate. This is done by the executor simply presenting the will to the County Court, and proving that it was duly executed and attested, or by so presenting it to the clerk of the County Court during a recess of the court, and proving it to have been duly executed and attested. This the clerk reports to the court at its regular session; and if no objection is made thereto, and none appears to the court, the court confirms the probate; it is ordinarily an *ex parte* proceeding, and is a proceeding *in rem ;* the court having jurisdiction to act in the matter simply by having under its control the original will itself. This proceeding *in rem,* like every other, would at once, as soon as the will was by the sentence of the court probated, be conclusive on the whole world, except that by statute any person interested may by a bill in equity impeach it. Such an *ex parte* proceeding, the court acting on the original paper, and pronouncing it the testator's will, or that it is not the testator's will, is properly speaking a proceeding *in rem.*

This being the nature and character of a proceeding *in rem* and of an *ex parte* proceeding, it would seem obvious that a regular suit between parties, either in a common-law court, or a court of chancery, though its object be not to recover either a judgment or decree against the defendant, but to claim a certain article of property, or to establish a claim or a lien on it, and have it sold by the court to satisfy the claim or lien on it, is not a proceeding *in rem.* An action of detinue, for instance, is not a proceeding *in rem;* nor is a suit in chancery to recover certain personal property to which the

plaintiff claims to have an equitable right, or to establish a claim against it, or an equitable lien upon it, a proceeding *in rem*, though no personal decree could be rendered against the defendant in such suits. So a suit in equity to subject certain personal property, the separate estate of a married woman, to pay a debt she has contracted, is not a proceeding *in rem*, but like all other suits of this character, is a suit *inter partes*, and the jurisdiction of the court exists from the time the summons to answer such suit is served on the defendant; and the jurisdiction of the court does not, as in proceedings *in rem*, depend upon the court or its officer having the possession of the property sought to be recovered, or the property sought to be sold to pay any claim on it set up in the suit.

A suit, then, brought in equity against a married woman to recover a debt, though it does not seek a personal decree against her, but only to sell certain personal property, her separate estate, is just as much a suit *inter partes*, and not a proceeding *in rem*, as any other chancery suit brought by a plaintiff against a defendant in which the plaintiff seeks no personal decree against the defendant, but only to establish some claim to property, or interest in it, or to subject it to sale to pay some claim or lien. Among the most familiar suits in the courts of this State, for instance, are suits to subject the real estate of a defendant to judgment liens. There can be in such suit no personal decree against such defendant, but only an order to sell his lands to pay the amounts of such judgments. But no one ever calls such suits proceeding *in rem*. They are suits *inter partes*. There are too common-law suits whose whole object is to recover certain property, and not to recover a personal judgment, such, for instance, as an action of ejectment. This is a suit *inter partes*, not a proceeding *in rem*.

A suit in chancery, then, brought against a married woman to sell her separate personal property, is a suit *inter partes*, not a proceeding *in rem*, and it must be governed by rules universally applicable to all suits *inter partes*. One of these rules, recognized from the earliest day, and applicable to all suits, whether in law or equity, is this: that, pending a suit *inter partes*, the rights of the plaintiff can in no manner be

affected by a sale of the property claimed in the suit by the plaintiff, or in which any interest is claimed by him in the suit, or by a sale of the property *pendente lite* which he claims he has a right to have sold to pay any claim or debt. The plaintiff's right can in no way be affected by any sale or disposition of the property by the defendant pending such suits *inter partes*. The plaintiff in any such suits, whether at law or in equity, has a right to proceed in such suit just as though no such sale had taken place; and it is entirely immaterial whether the purchaser of such property *pendente lite* had any knowledge of the existence of such suit or not. Public policy requires the recognition of this rule in all suits *inter partes*, whether they be common-law suits or suits in equity. It is applied, for instance, to actions of detinue or ejectment.

A *bona fide* purchaser without notice for value, *pendente lite*, in the possession of the land, may be ejected under a , judgment in ejectment against the defendant for said land, without instituting any new suit or proceeding against him. *Lessee of Smith* v. *Trabue's Heirs*, 1 McLean 87; *Jackson* v. *Tuttle*, 9 Cow. 233. So purchasers during the pending of a chancery suit are bound by the decree in the suit, without being made parties, (*Fash* v. *Ravesies*, 32 Ala. 451; *Shotwell* v. *Lawson*, 30 Miss. 27; *Hersey* v. *Turbett*, 27 Pa. St. 418; *Whiting* v. *Beebe*, 12 Ark. 428; *Gilman* v. *Hamilton*, 16 Ill. 225; *Kern* v. *Hazlerigg*, 11 Ind. 443); and they will not be protected because they paid value, and had no notice of the suit, (*Norton* v. *Birge*, 35 Conn. 250; *Ferrier* v. *Buzick*, 6 Iowa, 258.) This was held to be the law when a suit was brought to avoid a fraudulent conveyance, (*Copenheaver* v. *Huffaker*, 6 B. Mon. 18,) though this was a suit in which no personal decree could be had against the defendant. If, in any case, for any reason, a *pendente lite* purchaser becomes a party to a suit, he is bound by the proceedings in the suit subsequent to his purchase, though such proceedings were had before he became a party to the suit. *Turner* v. *Wight*, 4 Beav. 40; *Baker* v. *Pierson*, 5 Mich. 456; *Harrington* v. *Slade*, 22 Barb. 166; *Hersey* v. *Turbett*, 27 Pa. St. 418; *Pratt* v. *Hoag*, 5 Duer. 631; *Green* v. *White*, 7 Blackf. 242. The purchaser *pendente lite* is thus affected, not because he has notice, but because the law does not allow litigating par-

ties to give to others, pending the litigation, rights to the property in dispute, or sought to be subjected to any claim, so as to prejudice the plaintiff in such suit. *Newman* v. *Chapman*, 2 Rand. (Va.) 93. This doctrine rests upon public policy, and not notice. *Dovey's Appeal*, 10 Wkly. Notes Cas. 389.

It would be a vain thing to give to the plaintiff a right to have in any court a contest with a defendant, to establish any claim to real or personal property, or to subject it to any claim of any sort, if by selling the property pending the suit the defendant could render nugatory and useless the plaintiff's claim to or proceeding against the property. It would in effect deprive the court of all jurisdiction, and it would necessarily be an endless source of trouble and injustice to the suitors in the court. This rule as to *lis pendens* purchasers has therefore been universally adopted by all courts in suits *inter partes*. It is true, it sometimes operates very harshly on an innocent purchaser of the property *pendente lite*, who has bought and paid for it without any knowledge of the existence of the suit, or, it may be, without any possibility of obtaining such knowledge even by the exercise of any amount of diligence. Yet it has been applied in such instances, the courts considering it better that such an occasional injustice and wrong should occur, than that this rule as to *lis pendens* purchasers should be violated. For, if this rule be not observed, much greater wrongs and injustice would be constantly suffered by the plaintiffs in pending suits. In fact, if the rule was abolished, the claimants of specific property, or of a right to subject such property to certain claims, would be forced, in almost every case, to abandon their claims. The redress furnished them by the courts would, if this rule was abolished, in many cases become merely illusory. The remedy given them would be more imaginary than real. The *lis pendens* begins in chancery, when the summons is served, if a bill be subsequently filed; and it terminates with the final decree in the cause. *Anonymous*, 1 Vern. 318; *Powell* v. *Wright*, 7 Beav. 444; *Herrington* v. *Herrington*, 27 Mo. 560; *Newman* v. *Chapman*, 2 Rand. (Va.) 102; *Center* v. *Bank*, 22 Ala. 743; *Green* v. *White*, 7 Blackf. 242. A purchaser, between the

service of the summons and the final decree, is held to be a *pendente lite* purchaser, and must be subject to any decree the court may render in the cause.

I can see no reason why these general principles, applicable to all suits *inter partes*, should not be applied to a suit in equity against a married woman to subject to sale her separate property for the payment of her debt to the plaintiff. This Court has decided in *Hughes* v. *Hamilton*, 19 W. Va. 367 : "A general creditor of a *feme covert* may subject the separate estate of a *feme covert* to the payment of his debt, but with us he can not do it by obtaining a personal judgment in a court of law against the *feme covert*. His remedy is by a bill in equity to subject such separate estate to the payment of his debt." The thirteenth point in the syllabus is : "In such a proceeding, perhaps all rights acquired, from or under the *feme covert*, to her separate estate sought to be subjected, in the proceeding, to the payment of her debt, pending the proceeding, are subject to any decree which may be rendered in the proceeding, except so far as a purchaser may be protected by section 14 of chapter 139 of the Code of this State, as amended by chapter 68 of the Acts of the Legislature, passed February, 1877, p. 92. In all other respects the maxim, *pendente lite nihil innovetur*, applies."

The doctrines that a *pendente lite* purchaser from a married woman can acquire no right of property against the plaintiff in a suit brought against her to make his debt out of her separate estate, real or personal, is, by the last clause of this point of this syllabus, said to be as applicable to such a suit in equity as any other suit to subject property to any sort of claim. In the previous part of the syllabus, this is stated to be, perhaps, the case. It was stated in this manner, doubtless, because there was no purchaser *pendente lite* in the case before the court, and it was deemed therefore best to lay down this doctrine of a *pendente lite* purchaser without expressing it in positive language. What was directly before the Court in that case were those questions decided in the seventh, eighth and ninth points of the syllabus, that "a general creditor of a married woman has no lien or charge upon her separate estate prior to the institu-

tion of his suit in equity to subject such separate estate to the payment of his debt. But other general creditors of the *feme covert* may subsequently each file his bill to subject such separate estate to the payment of their respective debts; and such general creditors will be allowed priority of payment out of such separate estate, between each other, according to the time when their several suits were brought."

The reason why the rights of a creditor of a married woman, who has instituted a suit in equity to subject her separate estate to the payment of his debt against her, can not be altered or changed by a subsequent like suit brought by another creditor of the married woman, is that nothing done *pendente lite* was ever permitted to alter or modify in any way the rights of the party to any suit; and, as a matter of course, if this was, as it plainly was, applicable to a suit against a married woman to subject her separate property to the payment of a debt, as was held in that case, it would necessarily follow that a purchaser of her separate estate *pendente lite* could claim nothing against the person who had brought such suit. In other words, the doctrine of a *pendente lite* purchaser, applicable to all other suits *inter partes*, was equally applicable to such a suit. This is an absolutely necessary inference from what was involved in and necessarily decided in the case of *Hughes* v. *Hamilton*, 19 W. Va. 366.

There was in that case evidently a confusion of ideas as to the nature of a proceeding in a court of equity to subject the separate estate of a married woman to the payment of a debt. The eleventh point in the syllabus claims that it was in the nature of a proceeding *in rem*. The fact that it sought no personal decree against the married woman, but only to subject her separate personal estate to the payment of a debt, was the sole ground for regarding it in the nature of a proceeding *in rem*. But it was not borne in mind that there were many other suits in equity, as well as some at law, which sought no personal decree, but which were nevertheless obviously suits *inter partes*; such as suits to subject property held by the defendant to some equitable claim of the plaintiff, and many other equitable suits, and also ac-

tions of ejectment, as I have pointed out, in which no personal decree or judgment could be rendered against the defendant, but which no one ever called proceedings *in rem*, but which have always been considered as suits *inter partes*. In a very loose sense only could they be said to be proceedings in the nature of proceedings *in rem*, that is, that in these suits *inter partes* the object was to recover or subject to some claim a *rem* or property. In all suits of this character, as I have shown, the rights of the plaintiff to the property, or to subject it to his claim, could in no way be affected or varied by a *pendente lite* purchaser.

The failure to perceive that the real contrast is between suits *inter partes* and proceedings *in rem*, and not between suits whose object is to recover property, or subject it to a lien, and those which seek a personal decree or personal judgment against the defendant, led to the reference in the opinion in that case to *Cirode* v. *Buchanan*, 22 Gratt. 205. That was a case in which there had been no personal service on the defendant, a non-resident, but he had been proceeded against by order of publication. There has been, as we have seen, some controversy whether this was a proceeding in the nature of a proceeding *in rem* or a suit *inter partes*. I do not care to consider whether this decision was right or wrong, as it throws very little light on the question before us, which I am discussing; for, in the case before us, there was a personal service of the summons.

In the case before us, the plaintiffs, who were seeking, by a bill in equity, to make a debt due to them out of the separate personal estate of Helen M. Thompson, a married woman, by having it sold to pay their claim, which was for goods sold to her, and for which she and her husband, John P. Thompson, who was insolvent, had executed to the plaintiffs, in their firm name of Bruff, Falkner & Co., their joint notes. There was in the bill filed at March rules, 1883, the following allegation and prayer:

"They further say that the said Helen M. Thompson is the owner, in her own right, of a general stock of merchandise in her said store-room in said town, worth probably $800.00 at retail prices; and they are advised and charge that their said debt is a charge upon the said stock of merchandise,

and also upon the rents, issues, and profits of said real estate during the life-time of the said Helen M. Thompson. They further charge that she is the owner of the separate property, consisting of household goods chiefly, but they are unable to designate the several articles thereof, or their several values, but they are worth probably $300.00, upon which they insist that their debt is also a charge. They further say that the defendant, John P. Thompson is notoriously insolvent, and has no estate out of which the said debt, or any part thereof, can be made by process of execution upon any judgment that might be entered against him upon said demand, and that the separate estate of the said Helen M. consists chiefly of said stock of merchandise, now on sale in her said store, and the same is not more than sufficient to pay the plaintiffs' said demand, and that she is engaged in selling the said stock of goods, and converting the same into money, and that, unless the same is taken into the custody of this Court, they believe and charge that the same, or the proceeds of the sale thereof, will be eloigned or converted into money, and placed beyond the reach of the plaintiffs' demand, before the same can be matured and fully heard. They therefore pray that unless the said defendants, Helen M. Thompson and John P. Thompson, or some one for them, shall enter into bond with good security in a sufficient penalty, with condition to pay and satisfy the decree of this Court when the same is rendered, that the sheriff of Barbour county · be required to take into his possession enough of the said personal property of the separate estate of the said Helen M. Thompson to pay and satisfy the plaintiffs' said demand, upon such conditions as the court may deem necessary for the protection of the rights of the defendants, Helen M. and John P. Thompson, therein. And, the premises being maturely considered, they pray that the said debt may be declared a charge thereon."

On July 11, 1883, Helen M. Thompson filed her answer to this bill, which, so far as necessary to be stated in this case, is as follows: "Further answering, this respondent says that it is true that she at one time owned a stock of store goods, but, in order to meet the urgent demand of her creditors, she sold them, the proceeds of which were appropriated

towards the satisfaction of her debts. She further says that she denies that she is the owner of $300.00, or perhaps more, of household goods; but, on the contrary, she is only the owner of from $150.00 to $200.00 worth of household goods. The residue of her said property, both of store goods and household property, she has been compelled to sell to meet the exigencies of her family, and the importunate demands of her creditors. She further says that she is the mother of a large family, all of whom are dependent on her for support; that everything now in her store is the property of I. N. B. Crim, who has kindly agreed to furnish her with the goods, and allows her a small profit on said goods, which, together with her own labor, is all, or nearly all, consumed in the support of her household." The notorious insolvency of her husband is not denied.

An amended bill was filed by the plaintiffs in February, 1885, making James E. Heatherly an additional defendant; and so much of it as is necessary to be stated is as follows: "The plaintiffs by way of amendment to their original bill, heretofore filed in this cause, complain and say that, of the said general stock of merchandise owned by the defendant, Helen M., at the time said original bill was filed, and particularly mentioned therein, the defendant, Crim, after the institution of this suit, and after the filing of said original bill, and with full knowledge on his part that the plaintiffs, by the institution of this suit, had acquired a lien upon said merchandise, with the right to subject the same to sale to the payment of their said debts, procured the said Helen M. to sell and deliver to him a large portion of said merchandise, amounting in value to the sum of $607.00, which he then and there pretends to have paid her for said merchandise. And the plaintiffs further say that the household and other property mentioned in said original bill, and owned by said Helen M., consisted in part of a valuable cow, worth $35.00; and an organ, worth $50.00; and of chairs, carpets, beds, bedsteads, and bedding, pictures, books, and other articles, of the aggregate value of $400.00, which the said Helen M., long after the institution of this suit and the filing of said original bill, and with full knowledge on her part that the plaintiffs had acquired a lien thereon, sold and de-

livered the same to the said Heatherly, and he thereupon paid her the sum of $400.00 for said last-mentioned property."

A portion of the prayer of the amended bill is: "Unless their said debt be otherwise paid, that the said Heatherly be charged with the said sum of $400.00, and that the said Crim be, in like manner, charged with said sum of $607.00, or such part thereof as may be necessary to satisfy the demand of the said plaintiffs; and that they may have such other, further and general relief as the nature of this case may require, and to equity may appertain."

On March 7, 1885, Helen M. Thompson filed her answer to this amended bill, in which she says "that she admits that she sold a portion of the store goods, mentioned in said amended and original bills, to said defendant, Crim, as she thought then, and still thinks, she had a right to do; that said sale was made to said Crim in order to pay house debts due to him, and as a means of preserving and protecting her credit, and thereby to enable her to support and maintain her numerous family of little children, and that it was no violation of law or good faith for a married woman to pay honest debts out of her separate estate. Further answering, respondent admits that she sold some of her household property to her co-defendant, Heatherly, and that he, long before the said sale, paid her the money for the same; that this was done for the purpose of paying to said Heatherly a just and honest debt due from the respondent to him, and that said sale was made in good faith for the purpose, and not otherwise; that the organ and cow mentioned in said bill remained with respondent for some time, and then were taken off by said Heatherly, and disposed of by him, without any question from respondent."

On March 10, 1885, J. E. Heatherly filed his answer, in which he says: "It is true, as stated in said amended bill, that this respondent did purchase of said Helen M. Thompson a certain parcel of household goods, which was estimated to be worth $200.00, for which respondent paid her the money down; that Mrs. Thompson was very much in need of money, as respondent thought, to carry on her business of millinery, and asked respondent for said money, and pro-

posed to sell him the said articles of property; and respondent, not doubting her right to sell them, became the purchaser of them, as before stated. A copy of their contract, or the bill of sale of said property, is here filed, showing the various articles purchased, and the price paid for them, which is prayed to be received and read herewith as a part hereof, marked 'A.A.' Respondent denies that he had notice of the plaintiffs' said suit, and he also denies that said suit, if in fact it was pending at that time, was such a lien upon said property as would have prevented said Mrs. Thompson from selling it; and so respondent says that he purchased said property, and paid the money for it, in perfect good faith, and without any intention or even thought of wronging or defrauding the plaintiffs, or any other person, and he therefore asks the court to protect him in his said purchase. Further answering, respondent says that, at the time he purchased said property, he thought it well worth the money he paid for it, which was $200.00, as will be seen by reference to said bill of sale, a copy of which is heretofore exhibited; and respondent admits that some of said property he permitted to remain with Mrs. Thompson, as the use of it did not much impair its value, but other portions thereof he has taken away and disposed of some time since."

The Exhibit "A.A" referred to in this answer was a bill of sale made by Helen M. Thompson to James A. Heatherly, of all her furniture, for $200.00 in cash, and it is dated July 5, 1883.

In the answer of J. B. Crim, among other things, he says: "That he admits that he bought the stock of store goods belonging to said Mrs. Thompson, consisting of groceries, drugs, notions, and some dry goods, and perhaps some other goods, amounting in the aggregate to about $407.00, and this sale was made to him by J. P. Thompson, the husband and known agent of Mrs. Helen M. Thompson, some time about the 1st of February, 1883, long before any suit was brought by the plaintiffs to recover said goods, or to charge them with their said debt; and, at the time of said purchase, said goods were paid for except a small balance, which was paid about the 1st of April, 1883. So respondent emphatically and distinctly denies that he has had any notice whatever of the plaintiffs'

suit at the time he purchased said goods, and paid for them as above stated. Further answering, respondent further admits that he also purchased the millinery goods mentioned in said bills, but did not pay for them, or did not get them, or any of them, but that they were retained by said Mrs. Thompson, and used, consumed, or disposed of by her as she saw fit, without any suggestions or interference on the part of this respondent. Said millinery goods were estimated to be worth $200.00. These answers were replied to generally.

A commissioner, to whom these subjects of controversy were referred, reported on them as follows: " Your commissioner reports the following matter under said reference deemed pertinent: That, at the time this suit was instituted, the defendant, Helen M. Thompson, was the owner, in her own right, of the personal property in plaintiffs' bill mentioned, which has not been denied by answer, consisting of a general stock of merchandise, consisting of dry goods, notions, hardware, etc.; and that she was, at the same time, also the owner, in her own right, of household goods and furniture; and that, she was also, at the same time, the owner of a stock of millinery goods. And he further reports that, after the institution of this suit, some time about the last of March or first of April, 1883, Helen M. Thompson sold said stock of dry goods, notions, hardware, etc., to the defendant, J. N. B. Crim, at the price of $407.00; and, at about the same time, she sold to said Crim her said stock of millinery goods, at the price of $200.00. Your commissioner also reports that the said defendant, Helen M. Thompson, did sell to defendant, Jas. E. Heatherly, since the institution of this suit, and since the plaintiffs' bill was filed, a certain lot of the household and other goods, mentioned and referred to in plaintiffs' bill, at the price of $200.00, as will appear from copy of bill of sale marked 'A A,' filed with said Heatherly's answer in this cause. Your commissioner filed the deposition of John P. Thompson, Jas. E. Heatherly, and J. N. B. Crim, taken in this cause, marked 'B,' 'C,' 'D.'"

Crim and Heatherly filed exceptions to this report; two only of which I deem it necessary to notice; the other raising mere questions of law as to the notice on which the report was made, and as to time of filing report, and because the

plaintiff had no lien on the goods; and I do not deem that there is any merit in them, if the law in the matter is as I have stated. The two exceptions to which I refer is one of Heatherly's, that, though he purchased $200.00 worth of the furniture of Helen M. Thompson, yet he got only $100.00 worth of it, as the evidence, he contends, shows; and the other is an exception of Crim's, "that the evidence shows that the millinery goods never came into his possession."

The court, in its decree,—the one appealed from,—rendered October 22, 1886, overrules all these exceptions, and proceeds as follows: "On consideration whereof it is adjudged, ordered, and decreed that the said exceptions be, and the same are, overruled, and the said report is hereby confirmed. And, it appearing to the satisfaction of the court, from the said report, that the store goods and millinery goods in the plaintiffs' bill mentioned, owned by the defendant, Helen M. Thompson, at the time of the filing of the plaintiffs' original bill, were purchased by the defendant, J. N. B. Crim, from the said Helen M. Thompson, about the last of March, 1883, after the filing of the plaintiffs' original bill in this cause, and by him converted to his own use, and that the same were of the value of $607.00; and it further appearing to the court, from the said report, that, after the filing of the said orginal bill, the defendant, James E. Heatherly, on the 5th day of July, 1883, purchased from the defendant, Helen M. Thompson, and converted to his own use, certain other personal property belonging to the said Helen M. Thompson, at the time of the filing of said original bill, mentioned and referred to in said amended bill, and particulaly described in the answer of said Heatherly, and of the value of $200.00, —on consideration whereof the court is of opinion, and it is accordingly adjudged, ordered, and decreed that the plaintiffs, by the filing of their original bill, acquired a lien as of that date upon the said personal property so purchased by said Crim and Heatherly as aforesaid, and they are chargeable with the value thereof, with interest thereon from the time they respectively purchased the same; and it is therefore adjudged, ordered, and decreed that the same Joseph N. Crim do pay to the said plaintiffs the sum of $736.62, being the aggregate of the said sum of $607.00, with interest thereon

from the 18th day of April, 1883, to October 2, 1886, and that the said James E. Heatherly do in like manner pay to the said plaintiffs the sum of $240.16, being aggregate of the said sum of $200.00, with interest thereon from the 5th day of July, 1883, to said 22d of October, 1886."

I find nothing in the facts which the court found in this decree not sustained by the evidence.

It has been suggested that a description of the personal property, the separate estate of the wife, which it was the design of the plaintiffs in this suit to charge with the payment of the debt due from her, was too loose to affect a purchaser *pendente lite.* The law, as I understand it, is that the proceedings must relate to the specific property in question, and this must appear in the suit. This is stated by Chief Justice Johnston in *Lewis* v. *Mew*, 1 Strob. Eq. 183 : " The object of the bill was not the removal of the trustee, nor the transfer of the property. In the progress of the suit, the court became satisfied of the abuses of the trust, and of its own motion made the decree to that effect. There was nothing in the pleadings in that case, at the date of this purchase, to point the defendant's attention to the negroes he purchased as the identical negroes in litigation. They were not named in the bill, nor has the deed in which Manny was named exhibited. The principle of *lis pendens* is that the specific property must be so pointed out by the proceedings as to warn the whole world that they meddle with it at their peril. This is necessary to justice; for liberty is very much, though necessarily invaded, by executing a decree over a party's head, without allowing him a hearing. It is at least fair to grant him the means of informing himself when he is in a likely way of getting into such danger."

The bill in the cause before us certainly pointed out, with more than necessary precision, the property it sought to charge, to warn the purchasers that they meddled with the property of Helen M. Thompson at their peril. If they had known the law as to a *pendente lite* purchaser, the bill afforded them the most ample means of informing themselves that they were in a likely way of getting into danger.

The rule with reference to awarding an injunction, or appointing a receiver to take possession of the married woman's

separate property in such a suit, is properly laid down in *Todd* v. *Lee*, 15 Wis. 384 : "The issuing of the injunction, and the appointment of the receiver, was, under the circumstances, undoubtedly correct. They take the place of the process of attachment, when necessary and proper, in actions at law. Such was the practice under the former system in equity when there was no trustee of the separate estate, and the fund was in danger of being wasted, or put beyond the reach of creditors. It was the course pursued by the bill in *Lillia* v. *Airey*, 1 Ves. Jr. 277, and in *Church* v. *Jaques*, 1 Johns. Ch. 450, and instances of injunction where there were trustees are very numerous."

The appointment of a receiver never gives any advantage to the party applying to have such appointment made. See Baldwin, Judge, in *Beverly* v. *Brooke*, 4 Gratt. 208. The appointment of a receiver does not affect the title of property in any way. See Beach, Rec. § 1, and authorities cited. It is obvious, if the views I have expressed be correct, the appointment of a receiver of the property of a married woman, or the non-appointment of him, could in no way affect the right of her creditors (the plaintiffs) to charge her separate personal property with their debt. It is well said in *Green* v. *White*, 7 Blackf. 244 : "A purchase of a right which is undergoing a judicial investigation is a fraud upon the plaintiff, and it is so far considered a nullity that it can not avail against his title." See *Murray* v. *Lylburn*, 2 Johns. Ch. 441.

It was not, in this case, necessary to make J. E. Heatherly a party to the amended bill, he being a *pendente lite* purchaser, in order to get a decree to sell the property he had purchased *pendente lite*. But, he having thus improperly interfered with the property, he could properly be made a defendant, and held personally liable for the value of such property which he had purchased *pendente lite*. It was optional with the plaintiff to follow the property, disregarding his *pendente lite* purchase, or confirm the bill he got from Mrs. Thompson, which was good against her, by making him pay on his debt the value of this property. And so with Crim, a *pendente lite* purchaser, who was a party to the suit originally. The fact that they claim that they left the property with Mrs. Thompson after they purchased it from her

as a favor, and can not now get it in their possession, is entirely immaterial. Their purchase from her of this property, without its delivery, conferred on them, so far as she could make, as good a title as if they had taken possession of it, instead of leaving it with her as their bailee.

I see no error in the decree of the court of October 22, 1886, to their prejudice, and it should be affirmed, and they, the appellants, should pay the costs incurred by the appellees in this Court and $30.00 damages.

REVERSED.